IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**GRANDVILL D. LAWES**,

Plaintiff,

v.

**Q.B. CONSTRUCTION, ET. AL.,**

Defendants

**Civ. No.** 12-1473 (DRD)

OMNIBUS OPINION AND ORDER

*"The work of a judge is in one sense enduring and in another ephemeral.... In the endless process of testing and retesting, there is a constant rejection of the dross and a constant retention of whatever is pure and sound and fine." B. Cardozo, The Nature of the Judicial Process 178, 179 (1921).*

INTRODUCTION

On October 22, 2011, on or about 8:00 PM, Plaintiff Grandvill Lawes ("Plaintiff") was crossing at midblock from the northernmost sidewalk towards the southern sidewalk of Fernandez Juncos Avenue in San Juan, Puerto Rico. Upon crossing the two lanes of Calle del Tren, an arterial roadway immediately to the north of the Avenue, Plaintiff paused on the median between Calle del Tren and the Avenue. After pausing on the median, Plaintiff proceeded to cross the two westbound lanes and paused on the yellow divider between the westbound and eastbound lanes of the Avenue. However, a vehicle approaching in the northernmost eastbound lane trapped Plaintiff on the divider. Unable to cross the final two lanes, Plaintiff was forced to remain on the yellow divider for approximately twenty (20) seconds[1]. Shortly thereafter, when he attempted to evade the oncoming eastbound vehicle, Plaintiff moved slightly into the westbound lane and was struck by Rafaela Riviere-Andino's Toyota 4Runner.[2]

---

[1] The time Plaintiff remained on the yellow divider was derived from the testimony of Carlos Gordon to questions from counsel for CSA. *See* Docket No. 647 at 62-69.
[2] The events of October 22, 2011 were compiled from the testimony of merchant marines Rolando Medrano and Carlos Gordon, both present at the time of the accident.

Q.B. Construction, Inc. ("Q.B"), the general contractor of the *Bahia Urbana* project[3]; Q.B.'s insurance carriers; and CSA Architects and Engineers, LLP ("CSA"), the designers of the *Bahia Urbana* project's Management of Traffic Plan ("MOT") are the named defendants in this case. Through expert testimony, Plaintiff seeks to fault the aforementioned parties for defectively designing and implementing the MOT. Specifically, Plaintiff alleges "Defendant CSA [and] Defendant QB . . . who were supposed to be involved in the planning, design, implementation, and monitoring of the construction that displaced pedestrians, failed to provide the necessary safety measures for pedestrians that would have prevented the accident." Docket No. 492 at 4.

The MOT was the plan for the management of vehicular and pedestrian traffic affected by the *Bahia Urbana* construction project. *See* Docket No. 644 at 49, lines 16-22. CSA's plan for merchant marines, as Plaintiff was, called for them to exit their ships on Pier 9, take a slight turn westbound, and walk to the point of the intersection with Valdes Street, where a Spanish-language road sign warned him that the sidewalk was crossed and advised him to cross "here [at the crosswalk]." *Id.* at 54, lines 15-21; *see also id.* at 129, lines 17-19. Pedestrians were then to cross Fernandez Juncos Avenue at the crosswalk, under the protection of the stoplight, all the way past the arterial Calle del Tren, and walk into Old San Juan on the northernmost sidewalk. However, Plaintiff alleges that "(i) the defendants failed to design and or install important traffic signs; (ii) defendants failed to comply with General Note No. 9 which states that QB had to provide artificial illumination at all times; (iii) the defendants failed to comply with General Note No. 11 which required the installation of an orange mesh to insure the safety of pedestrian flow; (iv) defendants did not follow the applicable parts of the MUTCD, specifically Chapter 6." Docket No. 492 at 11.

Ralph Aronberg, Plaintiff's traffic engineering expert, concluded that Defendants' design and construction work caused Plaintiff's accident. Nevertheless, after several weeks of trial in the instant case,

---

[3] The Bahia Urbana project sought to revitalize Piers 7 and 8 in Old San Juan. The construction site limit was approximately ten to fifteen meters from the site of the accident.

the Court faced continuous challenges to the admissibility of Aronberg's testimony from Defendants Q.B. Construction, CSA, Integrand Assurance Company, and ACE Insurance Company, as well as Third-Party Defendants Rafaela Riviere-Andino, Puerto Rico Electric and Power Authority, and Miguel A. Bonilla, Inc. From April 19, 2016 to May 16, 2016, the Court held a *Daubert* hearing, spanning twelve full days, in order to resolve the issues regarding the admissibility of Aronberg's testimony.

## PROCEDURAL HISTORY

On April 27, 2016, the Court ordered Plaintiff to file a written opposition to Defendants' and Third-Party Defendants' requests for exclusion. Specifically, the Court ordered Plaintiff to file a motion addressing the lack of specificity of Plaintiff's preliminary expert's report, possible outright changes in the expert's opinions, and potential false statements made under oath. *See* Docket No. 754 at 62, lines 12-17.[4]

On May 4, 2016, Plaintiff partially complied with the Court's order and filed a *Motion in Compliance with 766 Court Order regarding the Alleged Ambush Suffered by the Defendants due to the Alleged Non Compliance by Plaintiff of Rule 26 and Rules 16 of the Federal Rules of Civil Procedure* (Docket No. 767). Plaintiff argued that "[i]f the opinions in the expert report were not as sufficiently detailed in the preliminary written report, [Defendants and Third-Party Defendants] had the opportunity to seek further explanation in depositions." Docket No. 767 at 6. Plaintiff avers that Defendants cannot cry foul at this stage because Defendants had two opportunities to depose Aronberg. Plaintiff then enumerated Aronberg's five primary opinions along with excerpts from Aronberg's depositions where those opinions appeared to have been discussed.

On May 5, 2016, Defendant Integrand Assurance Company ("Integrand"), insurer for Q.B.[5], filed a reply to Plaintiff's motion (Docket No. 773). Integrand asseverated that, even if Aronberg's written report

---

[4] The issue regarding Aronberg's possible false statements became moot the moment the Court ordered Aronberg to answer the questions posed during cross-examination. At that moment, Aronberg was essentially immunized from prosecution. *See Mallory v. Hogan*, 431 U.S. 181, 186-187 (1973).

[5] Q.B. Construction is the party against whom all of Aronberg's preliminary conclusions were directed.

complied with Federal Rule of Civil Procedure 26, his testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Integrand asserts that Aronberg's testimony lacks fact-finding value because of inconsistencies between prior opinions and opinions provided throughout the *Daubert* hearing. Further, Integrand claimed that Aronberg's conclusions do not rest upon sufficient facts or data, are not the product of reliable principles and methods, and do not apply to the facts of this particular case.

On May 16, 2016, upon concluding the *Daubert* hearing, the Court provided the parties a final opportunity to reduce their arguments to writing. The Court ordered all parties moving for exclusion of Aronberg's testimony to file their briefs in support of exclusion on or before May 24, 2016. Conversely, Plaintiff was ordered to respond to the movers on or before June 1, 2016.[6]

On May 24, 2016, Third-Party Defendant Rafaela Riviere-Andino ("Riviere-Andino") filed her Motion to exclude Aronberg's testimony pursuant to Federal Rule of Civil Procedure 26(a)(2) and Federal Rule of Evidence 702 (Docket No. 823). Riviere-Andino averred that Aronberg should be barred from mentioning Riviere-Andino in any of his opinions, as he never included her in his preliminary report or in the section of the *Joint Pretrial Order* pertaining to Aronberg's testimony. *See* Docket No. 492. Further, Riviere-Andino moved for Aronberg's testimony to be excluded under FRE 702 because it was not based on reliable principles or sound methodology, as the rule requires.

On May 25, 2016, Third-Party Defendant Puerto Rico Electric and Power Authority ("PREPA") filed its motion to exclude Aronberg's testimony under Federal Rule of Evidence 702 (Docket No. 826). PREPA assured the Court that Aronberg never disclosed any prior opinion against them. Additionally,  PREPA

---

[6] After Defendant Integrand moved for an extension, the Court provided all parties one additional day to file their briefs (Docket Nos. 819 and 820). On June 1, 2016, Plaintiff moved for a further extension to file his two remaining briefs and the Court granted Plaintiff's motion (Docket Nos. 851 and 852).

averred that Aronberg's previously disclosed opinions were based on unreliable methods which have now led to a constant shifting of opinions by Aronberg at the *Daubert* hearing.

On May 25, 2016, Defendant ACE Insurance Company ("ACE"), insurer for Q.B., filed its Motion, also under Federal Rule of Evidence 702, alleging that Aronberg's testimony did not satisfy the requirements of the Federal Rules of Evidence (Docket No. 827). ACE argues that Aronberg failed to adhere to accepted, peer-reviewed methodology before reaching his conclusions. Moreover, ACE listed several studies, which are allegedly necessary prior to providing opinions in these types of cases, all of which Aronberg failed to conduct. Finally, ACE echoed the arguments of prior movants that Aronberg had failed to base his opinions on reliable methodologies, as Federal Rule of Evidence 702 requires.

On May 25, 2016, Integrand filed its motion to exclude Aronberg's testimony under Federal Rule of Evidence 702 (Docket No. 829). Integrand provided excerpts from Aronberg's depositions and testimony at the *Daubert* hearing where Aronberg admitted that his opinions were solely directed at Q.B. Construction because Q.B. was the only named defendant at the time he was hired as an expert. Integrand further argued that Aronberg failed to consider all relevant evidence and, instead, picked and chose which evidence bolstered Defendants' liability while ignoring possibly exculpatory data. Integrand also listed the methodological flaws with each one of Aronberg's opinions.

On May 25, 2016, Defendant CSA filed its brief in support of Aronberg's exclusion pursuant to FRE 702 (Docket No. 830). CSA pointed to several instances where Aronberg "flip-flopped" between imposing liability on CSA, as the designer, and Q.B., as the contractor. Further, CSA asseverated that Aronberg did not review all relevant documents before providing his opinions and, as a result, his opinions were the product of unreliable methods. Finally, CSA moved for the exclusion of Aronberg's testimony pursuant to Federal Rule of Civil Procedure 26(a) for failing to adhere to pre-trial disclosure rules.

On May 25, 2016, Integrand filed another Motion, this time under Federal Rule of Civil Procedure 26(a) (Docket No. 831). In its motion, Integrand emphasized that Aronberg's preliminary report did not

disclose the basis for his conclusions and did not disclose which exhibits he planned to use at trial. Further, the documentary exhibits that Aronberg attached to his preliminary report delineated the duties of a project designer, while Q.B. is a contractor. Finally, Integrand explained the harm caused by Plaintiff's alleged violations to Rule 26(a), namely that Integrand was unable to conduct discovery on several points first made by Aronberg during the *Daubert* hearing.

On June 1, 2016, Plaintiff filed the first of his three (3) responses in support of the admission Aronberg's testimony (Docket No. 850). In response to Integrand's motion under Rule 702, Plaintiff's brief sought to demonstrate how Aronberg's opinions were indeed based on reliable methodology and were accurately applied to the facts of the case.

On June 2, 2016, Plaintiff filed his two (2) remaining briefs, one under Federal Rule of Civil Procedure 26(a) and another directly addressing points made in Defendant CSA's motion (Docket Nos. 855 and 856). Plaintiff's Rule 26 brief averred that Defendants could not claim that they had been "ambushed" or harmed by Plaintiffs failure to supplement Aronberg's preliminary expert's report because Aronberg was deposed twice and Defendants' experts allegedly discussed Aronberg's opinion in their own reports and/or depositions. Further, in Plaintiff's opposition to CSA's motion under FRE 702, Plaintiff shifts blame on CSA's engineer, Ruth Vargas, designer of the MOT, and claims that it was Vargas' inconsistent testimony that is to blame for Aronberg's alleged "flip-flopping.

<u>ANALYSIS</u>[7]

I.      FEDERAL RULE OF CIVIL PROCEDURE 26

A.      *Fed. R. Civ. P. 26(a)(2)(B)*

Rule 26(a)(2) provides that all written reports prepared by experts in anticipation of litigation must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case. Fed. R. Civ. P. 26(a)(2)(B).

Rule 26 better prepares attorneys to cross-examine opposing parties' experts at trial. *See Laplace–Bayard v. Batlle*, 295 F.3d 157, 162 (1st Cir. 2002). Under Rule 26, the Court has "broad discretion in meting out . . . sanctions for . . .  violations." *Id.*; *see also Samos Imex Corp. v. Nextel Communications, Inc.*, 194 F.3d 301, 305 (1st Cir. 1999)("[E]xclusion of evidence is a standard sanction for a violation of the duty of disclosure under Rule 26(a).").

The provisions of Rule 26 have been held mandatory since the adoption of Rule 37(c)(1), its sister rule. Pursuant to Rule 37(c)(1), "[any] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence ... any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1). Rule 37 "clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of [Rule 26]." *Klonoski, M.D. v. Mahlab*, M.D., 156 F.3d 255, 269 (1st Cir. 1998). "[T]he required sanction in the ordinary case is mandatory preclusion." *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004)(citing *Klonoski*).

---

[7] Motions to exclude Ralph Aronberg's testimony have been filed under both Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 702. The Court analyzes both motions separately.

The Court is tasked with ensuring that Rule 26 has been duly complied with by the parties. However, "in extreme cases, appellate review is a backstop." *Bartlett v. Mutual Pharmaceutical Co., Inc.*, 678 F.3d 30, 40-41 (1st Cir. 2012); *see also Gay v. Stonebridge Life Ins. Co.,* 660 F.3d 58, 64 (1st Cir.2011); and *Licciardi v. TIG Ins. Grp.,* 140 F.3d 357, 363–64 (1st Cir.1998). Once a decision has been made under Rule 26 to exclude proffered testimony, "the question on appeal is not whether [the First Circuit] would have imposed the same sanction . . . the question is whether the district court's action was so wide of the mark as to constitute an abuse of discretion." *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 642 (1976).). Consequently, a party who strives to overturn the trial court's exercise of its discretion under Rules 26 and 37 shoulders a heavy burden. *See Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Este And Sara Lopez, M.D.,* 456 F.3d 272, 275 (1st Cir. 2006)(internal citations omitted).

### B.    Ralph Aronberg's Preliminary Report

As a threshold matter, the Court must analyze whether or not Aronberg's written report complied with the Federal Rules of Civil Procedure. Aronberg rendered a preliminary expert's report on January 25, 2013.[8] *See* Docket No. 855, Exhibit 1. In addition to his conclusions, Aronberg attached the following documents: (1) his *curriculum vitae*, (2) a list of depositions and trial testimony provided in the prior four years, (3) a list of the data considered in preparing his opinions,[9] (4) a factual summary of the events of the accident, (5) his analysis and opinions and, (6) Sections 6D and 6H of the Manual on Uniform Traffic Control Devices ("MUTCD").

---

[8] Although the Court understands that Defendants' challenges to expert report itself should have been made at a prior stage in the litigation, the Court will nevertheless conduct a comprehensive analysis of each aspect of Plaintiff's compliance, or lack thereof, with Rule 26.

[9] Data considered by Aronberg: English translation of the Puerto Rico Police Accident Report; Police photographs taken at the accident scene on the night of the accident; other photographs taken of the accident site; daytime and nighttime aerial photographs of the accident site; Aronberg's own inspection of the accident site on July 16, 2012; Aronberg's inspection of Ms. Rafaela Riviere-Andino's 2006 Toyota 4Runner; construction plans; the 2003 and 2009 editions of the Manual on Uniform Traffic Control Devices; PREPA lighting records; and information provided by Plaintiff's counsel, Ramon Segarra-Berrios, regarding Plaintiff's actions the night of the accident.

Although, by his own admission, Aronberg's written report was preliminary, this does not excuse Plaintiff's non-compliance with Rule 26. Aronberg failed to provide "a statement of the compensation to be paid for the study and testimony in the case," which is a *per se* violation of Rule 26. *See* Fed. R. Civ. P. 26(a)(2)(B)(vi). Furthermore, Aronberg failed to attach the photographs that he used to bolster his opinions at the *Daubert* hearing and presumably intends to use at trial, which is another *per se* Rule 26 violation. Nevertheless, the Court will analyze each conclusion provided by Aronberg in his report with specific attention to whether or not each opinion should be admitted in light of the possible harm or prejudice posed by its admission and Plaintiff's justification for his noncompliance with Rule 26.

Aronberg wrote the following in the "Analysis and Opinions" section of his report,:

> The contractor created a dangerous condition that resulted in the accident by not providing a safe sidewalk and/or positive guidance in the use of sidewalks for pedestrians such as Mr. Lawes. The contractor did not take steps to ensure that the streetlights in the area were not disabled. [Plaintiff's] path of travel was reasonable given the guidance and facilities provided by the contractor. The contractor provided for two lanes of vehicular travel in the [eastbound] direction on Fernandez Juncos Avenue, but the right east lane was too narrow creating a hazard for drivers. The contractor should have limited [eastbound] traffic to one safe lane of travel in the [eastbound] direction and provided a continuous sidewalk on the [south] side of Fernandez Juncos Avenue. Given that the contractor did not provide a safe sidewalk, the contractor should have installed a barricade blocking and closing the sidewalk, forcing pedestrians . . . to cross Fernandez Juncos Avenue at the marked crosswalk to the [east] of the accident site. Positive guidance should have been installed upon [the] barricade in the form of a sign reading 'SIDEWALK CLOSED CROSS HERE.'[10]

Evidently, Plaintiff is unaware that expert-related disclosures are insufficient when they consist of "sketchy and vague descriptions of anticipated opinions or areas of anticipated testimony." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.,* 73 F.3d 546 (5th Cir. 1996); *see also Romero v. Drummond Co., Inc.,* 552 F.3d 1303 (11th Cir. 2008)(District Court acted properly in excluding experts whose reports consisted

---

[10] Aronberg's preliminary report contained the incorrect cardinal directions due to confusion stemming from the accident report prepared by Puerto Rico Police officers, which also contained the incorrect cardinal directions. Accordingly, what was referred to as "eastbound" in Aronberg's report was actually "westbound," and vice-versa.

of single paragraphs  explaining the expert's opinion and the basis for it. None of the reports stated the expert's opinions with sufficient specificity to allow defendants to prepare for rebuttal or cross-examination). At first glance, Aronberg's report spectacularly fails satisfy the requirement to provide all "basis and reasons" for expert opinions. *See Santiago-Diaz* 456 F.3d at 276 (After all . . . Rule 26(a)(2)(B) [calls] for the parties to make explicit and detailed expert disclosures.). In his conclusion, Aronberg condemns the "contractor's actions" which, he finds, led to a "very hazardous condition for pedestrians who needed to walk through the construction area." In closing, Aronberg stated "the hazardous conditions put into place by the contractor and others were the proximate cause of the accident," with no further explanation. Therefore, as a matter of law, Aronberg's report utterly fails to conform to the rule's specificity requirement. *See Id*. (Trial Court did not abuse its discretion in precluding testimony of an expert who submitted a report consisting of "two conclusory paragraphs"); *see also Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001)("The purpose of a 'detailed and complete' expert report as contemplated by Rule 26(a) . . . is, in part, to minimize the expense of deposing experts, and to shorten direct examination and prevent an ambush at trial . . . failure to include information concerning the retained expert that is specifically required by Rule 26(a)(2)(B). . . frustrates the purpose of candid and cost-efficient expert discovery.")(internal citations omitted).

Notwithstanding Plaintiff's insufficient expert report, the Court is not automatically obligated to exclude Aronberg's testimony. The Court may look to other factors that may justify the admission of the testimony. *See, e.g., Jackson v. Harvard Univ.,* 900 F.2d 464, 468–69 (1st Cir.1990). The First Circuit instructs lower courts to look to "the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects [when conducting an analysis under Rule 26(e)]". *Macaulay v. Anas*, 321 F.3d 45, 51 (1st Cir. 2003).

Here, the plaintiff's need for expert testimony favors him tremendously. The case at bar is a highly technical matter consisting of imposing liability upon a contractor and/or a designer of a construction project for an accident consisting of a pedestrian being struck by a moving vehicle. Plaintiff is now attempting to hold the contractor and designer of the *Bahia Urbana* project liable for the injuries he sustained that evening. Thus, the importance of Aronberg's testimony to Plaintiff's case-in-chief cannot be understated. Notwithstanding the above, the remaining analytical factors favor the movants.

First, the history of the litigation sheds an unfavorable light on Plaintiff. Time and time again, throughout trial and during the *Daubert* hearing, Plaintiff has attempted to introduce evidence with questionable admissibility through the backdoor. It often appears that the vagueness of Aronberg's opinions was a purposeful act by Plaintiff, who sought to leave the door open for shifting between a wide range of theories that fall within the meaning of the general conclusions provided in the written report. General phrases such as "positive guidance" and "the contractor did not take steps," without any elaboration or basis for them, facilitate the avoidance of impeachment during cross-examination as they provide a myriad of synonymous or analogous terms to slide under Aronberg's testimonial opinions.

Second, Plaintiff has not provided any justification for his noncompliance with Rule 26. Instead, Plaintiff has limited his responses to Defendants' motions under this rule to "proving" that Defendants have not been harmed or ambushed Plaintiff's noncompliance with Rule 26. *See* Docket No. 767 at 2 ("The plaintiff has met its burden of showing that the defendants were not 'harmed' and did not suffer any undue prejudice as a result of the plaintiff's 'deficient' preliminary report."). However, the Court may not ignore the Rule 37's requirement of substantial justification for noncompliance with Rule 26. In fact, the fact that Aronberg admitted he had provided a preliminary and incomplete expert's report weighs heavily against Plaintiff. Aronberg's sole reason for not supplementing his report was that Plaintiff's counsel failed to request him to provide a final, comprehensive report. *See* Docket No. 750 at 245, lines 22-25. The Court will never know what drove Plaintiff and Aronberg's decision to provide such vague and sketchy opinions.

11

The Court knows, however, that Plaintiff's decision to forego supplementation may have dire consequences. Notwithstanding the above, before making a finding on prejudice or harm to the defendants, the Court must first determine whether Plaintiff's deficient written report was duly supplemented to reflect any additions or changes in Aronberg's opinions.

### C.      Duty to Supplement

Because of the problems posed by last-minute changes in an expert's opinions, Rule 26 emphasizes full disclosure and subsequent supplementation of expert testimony if any changes to the expert's opinion arise. Specifically:

> "[f]or an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2);

*see also Tenbarge v. Ames Taping Tool Systems, Inc.*, 190 F.3d 862 (8th Cir. 1999)(A new trial was warranted because the trial testimony of defendant's expert contrasted sharply with his deposition testimony, and defendant did not supplement. Defendant clearly had a duty under Rule 26(e) to inform plaintiff of any changes or additions to the expert's testimony.). "This supplementation requirement increases the quality and fairness of the trial by narrowing [the] issues and eliminat[ing] surprise." *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 10 (1st Cir. 2001)(quoting *Licciardi v. TIG Ins. Group*, 140 F.3d 357, 363 (1st Cir.1998)).

As such, any "[c]hanges in the opinions expressed by the expert whether in the report or at a subsequent deposition are subject to a duty of supplemental disclosure under subdivision (e)(1)." Fed. R. Civ. P. 26(a) advisory committee's notes.  When the duty to supplement is violated, the Court has discretion to exclude the evidence.  *See Peña Crespo v. Puerto Rico*, 408 F.3d 10, 13 (1st Cir. 2005)(when an expert report fails to satisfy the specifics of the rule or when an expert opinion introduced at trial has not

been included in the expert's pre-trial report, the Court may exclude the evidence.). Plaintiff failed to supplement Aronberg's expert report after the expert was deposed twice knowing full well that Aronberg's deposition testimony had greatly expanded, and sometimes varied, from his written report.

As Plaintiff failed to comply with the Rule, the Court must embark on an opinion-by-opinion analysis of whether non-supplementation was or was not harmful to Defendants. *See* Fed. R. Civ. P. 37 (c)(1).

### D.    Harm to Defendants and Third-Party Defendants

Plaintiff claims that "[i]f [Aronberg's] original opinions were not sufficiently detailed in the preliminary written report . . . but the defendants had the opportunity to seek a more detailed explanation in the two depositions taken of the plaintiff's expert, [Defendants] can't conveniently come to court and argue that they have been [harmed]." Docket No. 767 at 3. Plaintiff, once again, misses the mark.

A Rule 26 violation does not become harmless solely because the expert was later deposed, nor does it become harmless because the Plaintiff baldly asserts he has "met his burden." Instead, the Court decides what is harmless and what is not. In doing so, the Court may look to any relevant factor, including the time and expenses incurred by parties, to evaluate any possible harm posed by a Rule 26 violation, if any. *See Primus v. United States*, 389 F.3d 231, 236 (1st Cir. 2004). "Surprise and prejudice [brought about by the non-compliance with Rule 26] are important integers" in the Court's analysis. *Curet-Velazquez v. ACEMLA de Puerto Rico, Inc.*, 656 F.3d 47, 56 (1st Cir. 2011).

### i.    Aronberg's Opinion Regarding the Pedestrian Detour or Deviation[11]

Defendant Integrand alleges it has been deprived of an opportunity to conduct necessary depositions and further discovery regarding directives and policies of the Puerto Rico Highway and Transit Authority ("PRHTA").[12] Specifically,  Aronberg's opinion that pedestrians should have been provided a

---

[11] Stated as: "the contractor should have limited [eastbound] traffic to one safe lane of travel in the [eastbound] direction and provided a continuous sidewalk on the [south] side of Fernandez Juncos Avenue."

[12] The determination to leave the southernmost lane open was made exclusively by the PRHTA. It was not made by Q.B. Construction or CSA. In fact, Ruth Vargas testified that her first MOT submission to PRHTA contemplated closing the southernmost lane. However, PRHTA returned the proposal with a denial of the application to close the lane and the instruction

continuous sidewalk on the southern side of Fernandez Juncos Avenue failed to account for the fact that the PRHTA had prohibited the contractor from implementing Aronberg's proposal that "the contractor should have limited [eastbound] traffic to one safe lane of travel." Instead, the PRHTA had prohibited the closure of the southernmost lane pursuant to its supreme authority to control and supervise Fernandez Juncos Avenue. *See* 9 P.R. Laws §2004(d). Surprisingly, this fact was known by Plaintiff's counsel prior to trial, as it was discussed by Ruth Vargas in her depositions.

Integrand notes that, originally, Q.B. intended to defend itself from this opinion based on the fact that Defendant CSA, not Q.B., was responsible for the design of the Management of Traffic Plan ("MOT") which called for the lane to remain open. However, at the *Daubert* hearing, Aronberg provided two previously undisclosed bases for his opinion—Specification 638 and Section 6B of the MUTCD. Thus, Integrand claims it was deprived of the opportunity to adequately prepare to defend itself in light of these two new bases for Aronberg's theory.

Plaintiff, in somewhat unorganized fashion, opposed Integrand's allegation of harm related to Specification 638 and Section 6B of the MUTCD. In his motion, however, Plaintiff justified Aronberg's reliance on the two documents during the *Daubert* hearing in light of a separate opinion ("monitoring opinion") and did not address the lane closure opinion. With respect to the lane closure, Plaintiff merely asserted that "from day one QB closed the lane unsafely . . . [and] should have closed the lane safely as opined my Aronberg in his Preliminary Report." Docket No. 855 at 12. Thus, Plaintiff's attempt at "proving" that Defendants have suffered no prejudice has been inadequate.

Defendants' harm is compounded by the fact that Aronberg faulted the contractor for defective MOT implementation throughout the entire litigation while maintaining that the MOT had been properly

---

to notify the PRHTA in case future lane closures were contemplated. *See* Docket No. 644 at 198, lines 6-10. Plaintiff's counsel, and later Aronberg, argued that CSA and/or Q.B. had a duty to appeal the PRHTA's decision. Further, this argument was manufactured at trial when Plaintiff was confronted with PRHTA's decision to leave the southernmost lane open. Thus, the Court finds no legal grounds for that argument and disregards it primarily due to its self-serving nature and its utter lack of support. Neither Q.B. nor CSA have dominion over the roadways in Puerto Rico. PRHTA has "complete control and supervision of any traffic or transportation facilities owned, operated, constructed, or acquired by it," 9 P.R. LAWS §2004(d).

designed. However, at the *Daubert* hearing, Aronberg shifted his position and opined that CSA had designed a "sloppy" MOT because it called for improper placement of cement barriers on the southernmost eastbound lane of Fernandez Juncos Avenue.[13] *See* Docket No. 812 at 65. The fact that Q.B., its insurers, and CSA, after conducting expensive and time-consuming discovery in preparation to cross-examine Aronberg, have been caught off-guard with new shifts in opinion strongly suggests that this Rule 26 violation was in fact harmful.

> ### ii.   *Aronberg's Opinions Regarding the Placement of the Cement Barrier and Positive Guidance*[14]

In his preliminary report, Aronberg concluded that the contractor should have blocked the southernmost sidewalk at the intersection, not midblock. Aronberg opined that the designer had properly left the sidewalk closed at mid-block in anticipation that a bus stop was to be placed between the barrier and the intersection. If CSA found out there was no bus stop, Aronberg's opinion was that the barrier had to be moved to the intersection. *See* Docket No. 663 at 3 (quoting Aronberg's Second Deposition). Throughout his first deposition, Aronberg stood by his position that the MOT had been properly designed and the problem was that Q.B. had incorrectly implemented it. However, at his second deposition, Aronberg slowly began to shift his opinion and asserted that Plaintiff's accident was caused, in part, by a design defect in the MOT. At the *Daubert* hearing, Aronberg reiterated the new opinion that the sidewalk had been improperly designed with a mid-block closing.

The prejudice posed by this shift in opinions lies in the "basis" Aronberg provided for imposing liability on CSA at the *Daubert* hearing—"engineering common sense."  Aronberg went one step further at

---

[13] This was one of many shifts in opinions provided by Aronberg during the *Daubert* hearing. In fact, Aronberg often shifted in his opinions on a day to day basis, as discussed below.

[14] Stated as: "the contractor should have installed a barricade blocking and closing the sidewalk, forcing pedestrians . . . to cross Fernandez Juncos Avenue at the marked crosswalk to the west of the accident site" and "positive guidance should have been installed upon [the] barricade In the form of a sign reading 'SIDEWALK CLOSED CROSS HERE.'" The Court clarifies that evidence was introduced at trial that there was, indeed, a sign cautioning pedestrians of a closed sidewalk ahead and advising them to cross at the intersection. The sign was attached to a cement pole several meters east of the intersection.

the *Daubert* hearing when he declared that his "engineering common sense" told him that Ms. Vargas had to:

> ". . . call up [the Metropolitan Bus Authority], speak with them and find out what they wanted to be done with that bus stop? Did they want to relocate it? And if they did, where did they want to relocate it. And if she wanted to make a suggestion to them where to relocate it, I guess she could. But she needed to find out where it was going to be relocated." Docket No. 811 at 253, lines 19-24.

Although Plaintiff has evidently failed to realize this, there are monumental implications in litigating a multi-million dollar case where the opposing party's expert has given three inconsistent opinions on three different occasions. This is precisely the reason the Rules impose the duty to supplement an expert's written report when the expert's opinions have varied in later depositions. *See Ortiz-Lopez* 248 F.3d at 35 (one of the purposes of Rule 26 is, in part, to prevent an ambush at trial). At trial, an expert with three inconsistent theories regarding the same alleged breach of duty poses a dangerous problem. Precisely, Aronberg would have the option to shift at will in order to avoid impeachment. Certainly this failure to supplement has not been harmless and the harm will only be aggravated if Aronberg is allowed to testify before the jury.

### iii. Aronberg's Inadequate Lighting Opinion[15]

Aronberg's final written opinion regarding Q.B. Construction's omissions concerns an allegedly defective light post on the southern sidewalk which. Aronberg concluded that the faulty lightposts contributed to Plaintiff's accident. However, under Puerto Rico law, Third-Party Defendant PREPA, who Plaintiff did not directly sue, is the sole entity with authority to interfere with or manipulate light posts. *See* 22 P.R. Laws § 196(g)-(l). Q.B. Construction cannot work on, improve, or attempt to fix those light posts. Thus, when confronted with this fact at the *Daubert* hearing, Aronberg pronounced for the first time that PREPA may be liable for the alleged lighting defect. *See* Docket No. 811 at 101. However, Aronberg, days

---

[15] Stated as: "The contractor did not take steps to ensure that the streetlights in the area were not disabled."

before, had reiterated that "the contractor had a duty to replicate the sidewalk on the south side of the road and that included lighting." Docket No. 755 at 146.

Adding to the prejudice posed by Aronberg's shifts in opinion is the fact that he again relied on Specification 638 and Section 6B of the MUTCD, which were both first disclosed as bases for his opinions at the *Daubert* hearing. As the Court has previously alluded to, an expert's basis is as important as his opinion when preparing to cross-examine the expert witness. As such, in the interest of avoiding repetition, the Court need not go further in discussing the prejudice posed by another shift in opinion by Aronberg.

### iv.   Aronberg's Monitoring Opinion[16]

Plaintiff correctly asserts that Aronberg discussed his "monitoring" opinion during his depositions. *See* Docket 855, Exhibit 2. However, in arguing that Defendants have faced no prejudice by having to defend against this opinion, Plaintiff seems to heavily rely on the allegation that Defendants' experts "discussed" the monitoring opinion in their own depositions and expert's reports. This again reflects Plaintiff's flawed understanding of Rule 26.

Rule 26 contemplates the idea that depositions tend to give way to in-depth discussion on any and all expert opinions. Accordingly, the rule requires parties to select and disclose which parts of the expert's deposition testimony will be reproduced at trial and which will not. The Rule, however, does not contemplate a deposition, often hundreds of pages long, as a suitable substitute for a supplemental expert's report. Plaintiff was under an obligation to disclose the substance of Aronberg's opinion, the basis for his opinion, the reasoning behind it, and Plaintiff's intent to have Aronberg testify about this conclusion it at trial prior to the Court-imposed deadline for pre-trial disclosures.  However, Plaintiff disclosed a general "monitoring" opinion without specifying the bases for the opinion until the *Daubert* hearing. Unsurprisingly, the bases were, again, Specification 638 and Section 6B of the MUTCD.

---

[16] Aronberg opines that, had Q.B. Construction conducted daytime and nighttime inspections in the area around the construction, they would have detected pedestrians crossing at mid-block and this accident could have been avoided.

### v.      Aronberg's Opinion that Plaintiff's Path was Reasonable

The Court need not entertain this opinion's implications too extensively. A superficial reading of the opinion, and an equally cursory look at Aronberg's *Daubert* hearing testimony[17], will prompt the conclusion that this opinion monumentally fails to meet the requirements of Rule 26. The opinion is unaccompanied by any basis, any reason, or any other information that would prepare an attorney to cross-examine Aronberg on this opinion. Again, it is as important to disclose an opinion's basis and reasons as it is to disclose the opinion itself. Whether or not it was discussed in Aronberg's deposition is immaterial.

### E.      Conclusions under Rule 26

Muhammad Ali's assertion that "the hands can't hit what the eyes can't see," is a pure manifestation of competitive bravado. In other words, he who moves fast enough can never be hit. Nevertheless, the courtroom is not a boxing ring and Aronberg may not employ Ali's defensive tactics on the witness stand. The Rules impose on Plaintiff the obligation to fully disclose the substance of Aronberg's testimony at trial prior to the Court-ordered deadline for pre-trial disclosures.[18] In other words, the Rules required the plaintiff and the defendants to come to the center of the ring and have a nice clean fight.

"The purpose of [Rule 26] disclosure rules is 'to facilitate a "fair contest with the basic issues and facts disclosed to the fullest practical extent." *Poulis-Minott,* 388 F.3d at 358. In multi-defendant, multi-million dollar litigation, an expert cannot purposefully provide vague and open-ended opinions. Experts must provide a written report that, not only complies with Rule 26, but obviates the need for an expert's deposition, as the framers of the rule envisioned. *Ortiz-Lopez* 248 F.3d at 35  (the purpose of a "detailed and complete" expert report as contemplated by Rule 26(a). . . is, in part, to minimize the expense of deposing experts, and to shorten direct examination). In the instant case, this basic purpose has not been achieved, as discussed above.

---

[17] Aronberg admitted he did not have sufficient data to perform an accident reconstruction and that he was unaware why Plaintiff crossed Fernandez Juncos Avenue where he did, because he could not enter Plaintiff's mind.  Docket No. 815 at 109, 113.
[18] Supplementation is to be done before the Pre-Trial Order is filed, not in the Pre-Trial Order itself.

Perhaps the ideal way to conclude the Court's Rule 26 analysis is to quote Aronberg himself. During the *Daubert* hearing and while under oath, Aronberg stated, matter-of-factly, that "[he] says what the problems are . . . [not] who is responsible for the problem." Docket No. 812 at 102. This quip, from an expert witness, reeks of undesirable litigation tactics. Instead, Aronberg's report was sketchy, vague, and open-ended. Meanwhile, Plaintiffs attempt to persuade the Court that eliminating such a grossly inadequate report, and subsequent testimony, would be an abuse of discretion. In other words, Plaintiffs are moving the Court to treat hundreds of pages of depositions as sufficient notice of Aronberg's testimony while ignoring the harm this would pose. Specifically, Aronberg provided an opinion regarding the contractor's duty to close the southernmost lane and build a pedestrian diversion. At the Daubert hearing, after being confronted with the PRHTA's decision to leave the lane open, Aronberg shifted that opinion to impose a duty upon the contractor and designer to file a reconsideration of the PRHTA's motion. Further, Aronberg also provided opinions in his report regarding the contractor's duty to provide illumination near the accident side. When confronted with applicable Puerto Rico law at the Daubert hearing, Aronberg again shifted his opinion and concluded that Third-Party Defendant PREPA, who Plaintiff elected not to sue, may have been liable for defective lighting at the scene of the accident.

If the Court were to allow this request, the defendants would now be forced to read hundreds of pages of depositions and prepare the opposing party's supplemental expert's report themselves. This is not the spirit of the Federal Rules of Civil Procedure. The Rules obligate parties to disclose the substance of an expert's proposed testimony, what parties an expert will fault for each alleged breach, and the bases for his conclusions. Plaintiff failed to disclose that information. Accordingly, the movants' request to eliminate Aronberg's testimony under Rule 26(a)(2)(B) is hereby **GRANTED**.

## II.     FEDERAL RULES OF EVIDENCE 403 AND 702

### A.     *FRE 403*

Under Federal Rule of Evidence 401, evidence is "relevant" if it has a tendency "to make a fact more or less probable than it would be without the evidence."   Joseph W. Cotchett, Federal Courtroom Evidence § 401.2 (Mathew Bender, 5th Ed.) (citing Fed. R. Evid. 401). Proffered evidence is not relevant if it does not prove or disprove a matter at issue or does not "assist the trier of fact in determining [any] facts necessary to its decision[.]"   *Id*.   Hence, evidence is relevant "if it makes it more probable that a consequential fact is true [or untrue]."   *Id.* at § 401.3 (citing *United States v. Mardirosian*, 602 F.3d 1, 11 (1st Cir. 2010), *cert. denied,* 131 S.Ct. 287 (2010)). The admission of relevant evidence is to be analyzed under a "liberal standard of admissibility."   *Id.* at § 401.4 (citing *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 6 (1st Cir. 2001)).   Any perceived weakness of the proffered evidence usually "go[es] to its weight, not to its relevance or admissibility."   *Id.*

Moving on, FRE 402 states that the general rule of admissibility of relevant evidence under FRE 401 persists unless otherwise provided by: the constitution of the United States, a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court.   *See* Fed. R. Evid. 402. Having described the general policy whereby relevant evidence is to be deemed admissible, the Court now provides the general standards of the most common exception.

FRE 403 authorizes the trial court to exclude otherwise admissible evidence when the probative value of the proffered evidence "is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Prior to coming to an ultimate determination under Rule 403, the Court must perform "a balancing analysis" whereby the probative value of a piece of evidence is weighed against its potential of: producing unfair prejudice, confusing the issues, misleading the jury, creating undue delay, and/or being unnecessarily repetitive.   *See* Federal Courtroom Evidence at

403.2.1. Performing the balancing act is only the beginning; the Court then must carefully review the potential results.

The exclusion of evidence is not the general rule. To the contrary, the "trial court's discretion to exclude relevant evidence under Rule 403 should be exercised with recognition that exclusion is extraordinary and to be invoked sparingly." *Id.* at § 403.2.1; *Harrington v. Hiller*, 883 F.2d 411, 414 (5th Cir. 1989) ("probative evidence should be 'sparingly' excluded"); *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001) ("Rule 403 is extraordinary remedy whose 'major function . . . is limited to excluding matter of scant or cumulative probative force . . .'"); *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003) ("trial court's discretion to exclude relevant evidence under Rule 403 should be exercised with recognition that exclusion is extraordinary and to be invoked sparingly, with trial court striking the balance in favor of admission in most cases").

"Because Rule 403 requires 'on-the-spot balancing' of probative value and prejudice, potentially excluding as unfairly prejudicial evidence that, nevertheless, is factually relevant," most, if not all, circuits review a trial court's determination using a "deferential standard." *Sprint/United Management Co. v. Mendelsohn*, 128 S.Ct. 1140, 1145 (2008) ("trial court 'virtually always' is in a better position to assess admissibility of evidence"). The Court is reviewed under an abuse of discretion standard. *See Gomez v. Rivera Rodriguez*, 344 F.3d 103, 115 (1st Cir. 2003). Nevertheless, the Court must provide any party that would be prejudiced by a determination to exclude evidence the right to express its position. *See United States v. Brooks*, 145 F.3d 446, 454-55 (1st Cir. 1998).

### B.    FRE 702

Because expert witnesses enjoy wide latitude to provide opinions and theories not based on first-hand perceptions, FRE 702 provides a hurdle beyond the requirements of FRE 403 for litigants to clear before their experts can testify at trial. *See Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81-82 (1st Cir. 1998)(finding that *Daubert* issues frequently collide with FRE 403 requirements).

Under FRE 702, an expert witness may provide opinion testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

FRE 702 has two primary policy goals. First, the rule seeks "to promote the trier of fact's search for truth by helping it to understand other evidence or accurately determine the facts in dispute."  29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6262 (2d ed.)(internal citations omitted). Second, the rule "seeks to preserve the trier of fact's traditional powers to decide the meaning of evidence and the credibility of witnesses by placing limits on the admissibility of expert opinion." *Id*. In sum, FRE 702 imposes on experts the duty to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Courts carrying out their gatekeeping functions under FRE 702 and *Daubert* are to have "considerable leeway" in determining reliability, as well as in reaching its conclusions under the Rule. *Id*. To word it differently, "Rule 702 grants the [Court] the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Id*. at 158; *see United States v. Jordan*, 813 F,3d 442, 445 (1st Cir. 2016)("Absent a material error of law, we will not second-guess such a discretionary determination unless it appears that the trial court 'committed a meaningful error in judgment.'"); *see also Quilez-Velar v. Ox Bodies, Inc.*, 2016 WL 2621133, at *3 (1st Cir. 2016).

### i.    *Reliability and Helpfulness of Expert Witness Testimony*

"Many aspects of science are a mystery to laymen without the aid of experts. In the world of the blind, the one-eyed man is king; and *Daubert* relevancy is the sentry that guards against the tyranny of

experts." *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 35 (1st Cir. 2012). Accordingly, before admitting it, the Court must ensure that expert testimony complies with the *Daubert* rule that expert testimony be based on scientific or technical knowledge beyond "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *but see Barefoot v. Estelle*, 463 U.S. 880 (1983) ("The more certain [an expert witness] is about his prediction, the easier it is for the defendant to impeach him."). Courts may exclude theories and conclusions when their sole connections to the data are the expert's own dogmatic statements. *Milward v. Acuity Specialty Products Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011)("conclusions and methodology are not entirely distinct from one another" and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")(internal citations omitted).

Trial courts must also ensure that expert testimony is tied to the facts of the case in a way that aids the jury in carrying out its fact-finding functions. *See Daubert* 509 U.S. at 591 (expert testimony which does not "fit" the facts of the case is "not relevant and, ergo, not helpful"); *see also Milward v. Rust-Oleum Corp.*, 2016 WL 1622620, at *3 ; ---F.3d ---- (1st Cir. 2016)(courts must "serve as the gatekeeper for the expert testimony by 'ensuring that [it] . . . both rests on a reliable foundation and is relevant to the tasks at hand.'")(quoting *Daubert*, 509 U.S. at 597). On the requirement that the testimony "help the trier of fact," Federal Practice and Procedure provides the following guidance:

> Clearly, **expert testimony does not "help" if it is unrelated to facts at issue or is based on factual assumptions that are not supported by the evidence.** Thus, an expert's demonstration that does not accurately reconstruct the facts of the case at bar fails to "help" the trier of fact. Expert testimony also **fails to "help" where the reasoning behind that testimony is so illogical that it cannot affect the probabilities of the existence of facts at issue.** In a direct echo of Rule 403 analysis, some courts conclude that expert testimony **fails to help if unfair prejudice outweighs probative value or if the testimony is very confusing or misleading**. Similarly, courts have concluded that expert testimony **does not help where it is ambiguous**. Wright & Miller § 6265.2 (emphasis ours).

As Plaintiff bears the burden of demonstrating the reliability of Aronberg's opinions by a preponderance of the evidence, the Court will analyze the methodology behind the opinion, the facts underlying the opinion, and the link between the facts and Aronberg's conclusions with special attention to the arguments in Plaintiff's opposition (Docket No. 850). *See Bourjaily v. United States,* 483 U.S. 171, 175–176 (1987)("Preliminary questions concerning the qualification of a person to be a witness . . . or the admissibility of evidence . . . should be established by a preponderance of proof.").

### ii.        Data Considered by Aronberg

In addition to not being speculative, reliable testimony "must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known." *Daubert* 509 U.S. at 590. Thus, the outcome-determinative prong in the Court's analysis is whether the "principles and methodology [employed by the expert witness]" are reliable. *Id.* at 595. The Court need not focus extensively on the expert's conclusions. *Id.* However, it is important to emphasize the requirement that an expert's testimony be reliable at each and every step. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354–355 (5th Cir. 2007). The reliability analysis applies to all aspects of expert's testimony: the methodology, the facts underlying expert's opinion, and the link between the facts and conclusion. *Id.*

Prior to providing his opinions at the *Daubert* hearing, Aronberg reviewed the following documents and relied on the following data:

1. Deposition of merchant marine Carlos Gordon;
2. Deposition of merchant marine Rolando Medrano;
3. PRPD photos taken at the scene of the accident;
4. Aronberg's site visit on June 6, 2012;
5. MOT and its General Notes;
6. Deposition of Ruth Vargas;
7. Deposition of Edgardo Velez;
8. MOT pages 20 MT 101, 20 MT 102, and 20 MT 103;
9. 10 CD 101, a document attached to Ruth Vargas' Deposition; and
10. A photo of the median between Calle del Tren and Fernandez Juncos Avenue.

Neither case law nor the Rules require courts to scrutinize the sufficiency of the data relied upon by an expert witness. Nevertheless, reliability is a subjective analysis. Consequently, when an expert, having had the opportunity and the means to evaluate relevant evidence, fails to do so, the Court may draw inferences as to the reliability of the testimony's support. *See Ruiz-Troche* 161 F.3d at 81 (Trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable).

Here, Aronberg did not mention analyzing any contractual documents pertaining to the *Bahia Urbana* project, which would be supremely relevant to his task. This information becomes especially relevant when assigning responsibility for the various alleged faults with the design and implementation of the MOT. By failing to familiarize himself with the duties of the defendants within the *Bahia Urbana* project, the Court witnessed several instances during the *Daubert* hearing where Aronberg learned new facts about Defendants' roles and responsibilities and shifted in opinion regarding the respective fault of the parties. *See* Docket No. 811 at 101 (Testifying, for the first time, that PREPA may be responsible for faulty lighting near the accident scene); see also Docket No. 812 at 65 (Declaring, for the first time, that CSA designed a "sloppy" MOT).

Aronberg similarly did not take the time to familiarize himself with relevant Puerto Rico law. Although familiarity with the law is an attorney's duty, Aronberg's opinions, especially those regarding lighting, disregarded important legal provisions. *See* 22 P.R. Laws § 196(g)-(l) (delineating PREPA's powers and duties, including maintenance and repair of public utilities). As a result, Aronberg provided testimony throughout the litigation regarding Q.B.'s duty to provide adequate lighting near the accident in direct contravention of PREPA's authority over lightposts in Puerto Rico.

On April 24, 2016, while testifying as to his qualifications as an expert, Aronberg testified that he has received the Institute of Transportation Engineers ("ITE")[19] Journal on a monthly basis for forty (40) years and he would review the journal's peer-reviewed articles in order to keep informed on "traffic safety issues, including [the American Association of State Highway and Transportation Officials], including the MUTCD." Docket No. 739 at 10, lines 5-14. During the *Daubert* hearing, Aronberg was confronted with an article from the ITE Journal, written by Himat Chadda, whose 1984 ITE Journal Article Aronberg admitted he had "always relied on." *Id.* at 28, line 16.

Chadda's article provided the "do's and don'ts" for traffic engineers preparing to serve as expert witnesses. *Id.* at 55, lines 10-11. The article instructs engineers to collect "all the necessary field data, data from agency files, pertinent published materials, traffic data, and accident data." *Id.* at 57, lines 18-21. The article also categorizes the police accident report as "the weak link in the entire information system," *id.* at 58, and instructs engineers to "carefully study the statements from accident witnesses." *Id.* at 60, lines 4-12. Ironically, Aronberg's prior testimony directly contradicted Chadda's peer-reviewed methodology. Notably, Aronberg testified that it is not important to interview the fact witnesses. Instead, Aronberg testified that the accident report is the important document. *See* Docket No. 739 at 80, line 2 and line 18.

Finally, and perhaps most telling, is Aronberg's failure to perform several tests which, according to Chadda's article, are critical before testifying as an expert in cases such as this one. Specifically, Aronberg did not perform a vehicle capacity study, a peak pedestrian/vehicular volume study,[20] and did not visit the accident site at the day and time most similar to the date of the accident, which Chadda finds important.[21]

---

[19] Aronberg referred to the ITE as "the most widely recognized organization for transportation engineers in the world." Docket No. 811, at 30, lines 1-3.

[20] These studies are relevant in order to ascertain the proper category for a particular roadway which, in turn, determines how wide its lanes should be. In light of the importance of the width of the southernmost lane, the Court understands this test would have been important

[21] The accident occurred on a Saturday evening, when the merchant marines were docked in Puerto Rico. Aronberg admitted that he visited the accident site during the daytime on Wednesday, June 6, 2012, a day and time where there were no merchant marines docked in the piers. *See* Docket No. 811 at 60, lines 13-16.

*See* Docket No. 811 at 59, line 9-10 ("A visit to the accident site during the time of day when the accident occurred is also important.").

In conclusion, it appears Aronberg did not analyze data that was both available and supremely relevant to his tasks at hand. On the other hand, Aronberg has employed methodology which unquestionably contradicts peer-reviewed methodologies proscribed by the ITE Journal, a journal which Aronberg considers a supreme source for traffic engineering experts. In light of these findings, it is apparent that the data Aronberg considered does not lend the proper support to the opinions he would provide at trial. Although the data Aronberg did consult was relevant and important, the weight of the data Aronberg failed to consider is overwhelming. Nevertheless, in order to leave no stone unturned prior to reaching its conclusion, the Court will scrutinize the support and methodology for each individual opinion provided by Aronberg at the *Daubert* hearing to ascertain whether it clears the muster of FRE 702.

### iii.       Reliability of Aronberg's Opinions

### Reliability of Aronberg's Monitoring Opinion

Aronberg concluded that if Q.B. had monitored the area surrounding the construction, Q.B. could have remedied the "problem by providing a pedestrian corridor, installing a mesh at the medium, or barricading the sidewalk next to the pier." Docket No. 850 at 1. Because the MUTCD allegedly requires contractors to "set up [monitoring plans] under 'varying road volumes,'" Aronberg concluded that, had Q.B. implemented an "adequate monitoring plan [they] would have detected the problem [of pedestrians crossing at midblock]." *Id.* at 17.  Once the problem had been detected, Aronberg opined that Q.B. could have installed a pedestrian corridor, a safety fence on the median between Calle del Tren and Fernandez Juncos Avenue, or closed the sidewalk at the intersection.

Despite Plaintiff's assurance to the Court that this opinion is the product of reliable methodology, the opinion assumes several crucial facts and omits equally crucial details. First, there must be a reliable basis upon which to conclude that a monitoring plan would have detected pedestrian's crossing at mid-

block. On this, Plaintiff argues in his opposition to Integrand's motion that the trial testimony "of the boat workers was to the effect that immediately after the barrier was installed all the pedestrian neighbors started to do midblock crossings." Docket No. 850. However, Gordon and Medrano, whose depositions Aronberg used as grounds for his opinion, testified the following at trial:

> **Cobian**: . . . after the barrier, where were you walking? On top of what?
>
> **Medrano**: Out on the road. And it wasn't just me, on occasion there were tourists that also followed that route. Elderly tourists. I was able to see them **on several occasions scurrying along the edge of the concrete barriers on the edge of the road**. Docket No. 645 at 160, lines 19-25 (emphasis ours).
>
> **Cobian**: . . . whether the midblock -- the barricade was at midblock or whether the barricade was at the traffic light, you would still try to avoid the unsafe situation by going through -- skirting through the south side of the concrete barriers; is that correct? You know, I don't remember the last question I made. If you remember it, answer it. If not –
>
> **Gordon**: Yes, sir. You see I draw the line; right? That's outside the concrete barrier. I done that before . . . sir, let me explain to you. Why we stopped outside. **We used to use the outside of the barrier, outside of the construction . . . Toward San Juan and back to the vessel. But we almost got run down**. Docket No. 647 at 94, lines 1-23 (emphasis ours).

Furthermore, fellow merchant marine Ricky Ferrol testified that he and Plaintiff crossed Fernandez Juncos Avenue at the crosswalk, as the MOT envisioned, on several occasions after the barriers had been installed. *See* Docket No. 659 at 12, lines 3-11. In light of the above, it appears that not all pedestrians were crossing at midblock immediately after the barrier was installed, as Plaintiff insists.[22]

Moreover, the evidence at trial was that merchant marines left the boats in scattered groups, not all together. On the evening of the accident, for example, Plaintiff went to dinner with Carlos Gordon, Rolando Medrano was leaving the boat when they were returning, and Oliver Scotland remained aboard the boat.

---

[22] The evidence is clear that pedestrians did not cross at midblock "all the time." This type of misrepresentation of the evidence is highly improper and the Court may, in its discretion reprimand counsel for engaging in these types of acts. *See* Local Rule 83E ("[a]ny attorney admitted to practice before this Court **may . . . reprimanded, or subjected to such other disciplinary action as the circumstances may warrant for misconduct defined in these Rules, and for good cause shown, and after notice and opportunity to be heard**.")(emphasis ours); *see also* Model Rule of Professional Conduct 8.4(c)("It is professional misconduct for a lawyer to engage in conduct involving . . . **misrepresentation**.")(emphasis ours).

Thus, the categorical assertion that a monitoring plan, which Aronberg admitted did not require nightly inspections under Section 6B of the MUTCD,[23] would have detected a midblock crossing problem has little support in light of the random crossing and skirting patterns that the merchant marines testified to.  *See Milward*, 639 F.3d at 15 ("Expert testimony may be excluded if there is 'too great an analytical gap between the data and the opinion proffered.'")(internal citations omitted).

Second, there must be a reliable basis upon which to conclude that Q.B. Construction had the means and ability to either install a pedestrian corridor, a safety fence, or move the barrier to the intersection. Nevertheless, the evidence presented at trial and at the *Daubert* hearing strongly suggests the opposite.

PRHTA, the government entity with control over Fernandez Juncos Avenue, expressed itself categorically against the closure of the southernmost lane for the construction of a pedestrian diversion. *See* 9 P.R. LAWS §2004(d). Specifically, the PRHTA instructed CSA to maintain the lane open from 11:00 AM to 9:00 PM every day. *See* Docket No. 865, Exhibits 1 and 2.  Furthermore, Ruth Vargas testified that her first MOT submission to PRHTA contemplated closing the southernmost lane. *See* Docket No. 644 at 198, lines 6-10. However, PRHTA denied the proposal to close the lane and instructed CSA to notify the PRHTA in case future lane closures were contemplated. *See id*. Thus, no evidence on the record supports Aronberg's opinion that Q.B.'s failure to close the lane was a breach of their duties under the MUTCD. In light of the above and in light of the fact that Plaintiff's accident occurred at 8:00 PM, which is within the time period during which the southernmost lane had to remain open, there is simply no reliable basis upon which Aronberg could provide this opinion.[24]

---

[23] *See* Docket No. 755 at 110.

[24] Aronberg's opinion is based on his idea that the southernmost lane was essentially already "closed" because it was two-feet narrower than the ten-foot lane AASHTO allegedly required. Aronberg himself admitted that AASTHO's guides do not state this and also admitted that several roads in Puerto Rico are narrower than ten-feet. Finally, this lane categorization would only be made after performing an Average Annual Daily Traffic test, which Aronberg did not perform. *See* Docket 811 at 22-25.

When confronted with the PRHTA's decision, Aronberg concluded that there was an obligation on Q.B. and CSA to file a reconsideration of the PRHTA's denial of CSA's request to close the lane. *See* Docket No. 811 at 107-109.[25] The Court then confronted Aronberg with this opinion and the sequence of events it entails. Namely, Q.B. would first have to send a request for information to CSA. CSA would then have to request reconsideration from PRHTA. If PRHTA were to grant the reconsideration regarding the lane closure, which the evidence does not support, CSA would then have to request the project owner's permission to incur in necessary expenses related to design of the lane closure. After its design, the lane enclosure and deviation would have to be built by Q.B. This is the very definition of speculation. *See* Docket No. 811 at 101-111.

Finally, when confronted with this absurdity and speculative nature of this new opinion, Aronberg concluded that it was feasible to run the pedestrian corridor through the construction. However, here, Aronberg ignored the fact that this would entail pedestrians trespassing over piers under the dominion of other entities, as well as pedestrians being directed through an area where construction vehicles and trucks enter and exit the construction site. *See Id*.

Now the Court turns to the installation of the safety fence on the median. This opinion, too, lacks any basis on the record. In fact, the only evidence regarding control of the median was entered through cross-examination at the *Daubert* hearing. Specifically, Aronberg admitted that PRHTA had performed construction on the median during the time between the design phase and the implementation of the MOT. *See* Docket No. 811 at 98, lines 14-25. Other than that exchange, there has been no evidence entered on the record that would suggest that Q.B. Construction or CSA had the authorization or the means to install a safety fence on the median outside the limits of the construction, only Aronberg's own testimony. Therefore, there exists no factual basis upon which Aronberg may base his opinion regarding the viability of a

---

[25] It was Plaintiff's Counsel Jorge Izquierdo-San Miguel who first proposed this "reconsideration theory" when confronted with the fact that the PRHTA had categorically prohibited the closure of the lane yet was never brought as a defendant in this case.

pedestrian corridor or an orange safety fence on the median. The Court may not permit Aronberg to provide a conclusion which rests solely on the expert's speculation. *See Daubert* 509 U.S. at 590 (Reliable testimony "must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known.").

### *Reliability of Aronberg's Opinion Regarding Placement of the Barrier*

The unreliability of Aronberg's opinion regarding the placement of the cement barrier on the southernmost sidewalk is less about the underlying data and more about its lack of logic. Namely, Aronberg found no problems with CSA's MOT design. Aronberg prefaced this opinion by stating that his conclusion would change if facts came to light that CSA knew or should have known that a bus stop to be installed between the barrier and the intersection was, in reality, never going to be installed. *See* Docket No. 663 at 3 (citing Aronberg's Second Deposition at page 20). Once Aronberg was made aware that CSA did not conduct an exhaustive inquiry into the status of "the bus stop that never was," Aronberg called upon his "engineering common sense," to conclude that Ms. Vargas had to call the Metropolitan Bus Authority ("MBA") and find out where the bus stop was to be located. *See* Docket No. 811 at 253, lines 19-24.

Finally, after one preliminary report, two depositions, and several days of a *Daubert* hearing, Aronberg concluded for the first time that CSA bore some fault for Plaintiff's accident. Aronberg also concluded that CSA designed a "sloppy" MOT because it had called for an allegedly improper placement of cement barriers infringing on the southernmost eastbound lane of Fernandez Juncos Avenue.

To say that the Court is skeptical of Aronberg's "engineering common sense" is an understatement. In fact, Aronberg's opinion lacks any common sense. First, Aronberg's conclusion that Ruth Vargas had to find out whether or not the bus stop was to be relocated is unsupported by anything other than his alleged "common sense." However, an opinion must rest upon much more than the expert's own statements to satisfy FRE 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Second, the Court cannot admit evidence regarding a possibly dangerous condition if that condition did not have any bearing on the accident. Hence, the placement of the barrier is irrelevant to this case as no evidence has been presented to support the notion that the midblock barrier on the southernmost sidewalk did not prompt Plaintiff to cross at midblock from the northernmost sidewalk to the southernmost sidewalk. In conducting the requisite FRE 403 balancing test of probative value of the evidence against the risk of misleading the jury or confusing the issues, the Court finds that the testimony Plaintiff is attempting to elicit would have the counter-productive effect of misleading the jury while having little, if any, probative value.

Testimony regarding a possibly negligent placement of the barrier on the southernmost sidewalk does not make more likely CSA's liability to Plaintiff for his accident on October 22, 2011. Even if Defendants were negligent in placing the barrier where it was, no evidence on the record suggests that blocking the sidewalk at the intersection would resulted in pedestrians using the crosswalk. This is especially true when considering the testimony of all merchant marines that their primary concern when deciding where to cross was the "hot corner" near the Salvation Army building on the northwest corner of the intersection between Fernandez Juncos Avenue and Valdes Street, an area where several homeless men gathered in the evenings. *See* Docket No. 645 at 67, lines 1-3 (testimony of Oliver Scotland regarding the "hot corner"); *Id.* at 228, line 13-16 (testimony of Rolando Medrano regarding the "hot corner"); Docket No. 647 at 37, lines 3-7 (testimony of Carlos Gordon regarding the "hot corner" and being offered marijuana on one occasion by one of the beggars); and Docket No. 659 at 17, line 25 (testimony of Ricky Ferrol regarding the "hot corner")[26]. However, that no defendant is or would be responsible for the activities alleged to have occurred on the hot corner. Instead, Puerto Rico law provides that Municipalities are

---

[26] The Court emphasizes that the "hot corner" issue has no bearing on the liability of any of the named parties. The corner itself was not under the dominion of any party, nor were the alleged beggars who would gather on the corner. Furthermore, some merchant marines testified that the stoplight at the intersection of Fernandez Juncos Avenue and Valdes Street, at times, did not work properly. However, the stoplight was unquestionably functioning properly on the night of the accident. *See* Plaintiff's Exhibit 9-H and 9-X; *see also* Docket No. 785 at 10, lines 19-21 (photographs taken at the scene of the accident at approximately 10:00PM on the night of the accident by Agent Luis Torres-Ostolaza).

responsible for maintaining their sidewalks "reasonably safe." *Del Toro v. Gov't. of the Capital*, 93 P.R.R. 467, 471 (1966)("The municipalities are bound to maintain their streets and sidewalks in reasonably safe condition for the persons who usually travel thereon.")(quoting *Davidson v. H.I. Hettinger & Co.*, 62 P.R.R. 286 (1943) and *Velez v. The Capital*, 77 P.R.R. 663 (1954)).

Lastly, Plaintiff was no stranger to the conditions of the area during the construction. It follows that Plaintiff was not surprised or caught off-guard by the cement barrier on the southernmost sidewalk, and he was not forced to cross at mid-block as a result. Instead, Plaintiff was crossing from the northernmost sidewalk towards the south, at midblock, for unknown reasons. There is no evidence on the record that supports the conclusion that the placement of the barrier had any bearing on the sequence of events leading to Plaintiff's accident. Accordingly, Aronberg may not provide a conclusion that lacks any support, does not fit the facts of the case, and is irrelevant to the tort in question. *See Daubert*, 509 U.S. at 591 (finding that expert testimony which is irrelevant is not "helpful," as FRE 702 requires); *see also Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25-26 (1st Cir. 2006) ("the question of admissibility 'must be tied to the facts of a particular case.'")(citing *Kumho Tire,* 526 U.S. at 150).

### *Reliability of Aronberg's Opinion Regarding Lighting*

Aronberg referred to Note #9 in Specification 638 in support of his conclusion that "[t]he contractor shall provide adequate illumination to the work area at all times." First, the Court notes that Aronberg mentioned this document for the first time at the *Daubert* hearing. Second, Ruth Vargas had previously testified at trial that Note #9 did not require Q.B. to ascertain whether the light post on the southern sidewalk within the construction site was functioning properly. Specifically, Ms. Vargas testified that Q.B. Construction was under a duty to provide lighting only if the contractor was "moving a lightpost, or turning one off, or illuminating one as part of the project construction." Docket No. 645 at p. 20, lines 13-21.[27]

---

[27] No other witness has testified regarding Note #9. Ruth Vargas' testimony on this matter is the only evidence on the record.

FRE 703 does not permit an expert to disregard facts admitted into evidence. *See* Fed. R. Evid. 703. Whether or not Ms. Vargas' testimony is untruthful or lacks credibility is an issue for the jury to decide. If Plaintiff felt Ms. Vargas was being disingenuous or otherwise untruthful in her testimony, Plaintiffs' counsel should have attempted to impeach her or discredit her while she sat on the witness stand. However, because Plaintiff's counsel failed to do so, Vargas' testimony regarding Note #9 is unchallenged. Further debilitating Aronberg's opinion is the fact that PREPA is the sole entity authorized to repair lightposts in Puerto Rico. *See* 22 P.R. LAWS § 196(g)-(I). Consequently, Aronberg may not testify as to Q.B's duty to provide illumination to the construction site as it would be contrary to the uncontested evidence presented at trial. *See Daubert*, 509 U.S. at 591 (holding that evidence or testimony must "fit" to the issues and facts of the case).

### *Reliability of Aronberg's Opinion Regarding Plaintiff's Path on the Night of the Accident*

Any opinion regarding the path taken by Plaintiff on the night of the accident, and his reasons for doing so, is speculative. Witnesses at trial have testified to taking several different routes to and from Old San Juan. Further, the "hot corner" weighed heavily on the minds of the merchants marines when electing to cross at midblock, instead of at the crosswalk. Finally, Aronberg is unable to enter Plaintiff's mind, has never been able to interview Plaintiff, and Plaintiff has no recollection of the night of the accident. The only support for this conclusion is Aronberg's own speculation.

During the *Daubert* hearing, Aronberg stated that he did not know why Plaintiff crossed. Aronberg also stated that Plaintiff had time to return to the median once the light turned green and Rafaela Riviere-Andino's Toyota 4Runner went in motion. *See* Docket 811 at 145-147. In fact, Aronberg stated Plaintiff "should have never been in the road." *Id*. at 179, line 15. Thus, Aronberg's assertion that Plaintiff's path was reasonable is illogical, speculative, and, accordingly, does not satisfy FRE 702.

### iv.        Reliability of Aronberg as a Witness[28]

Having discussed the unreliability of each of Aronberg's opinions, the Court now turns its attention to Aronberg's contradictory testimony throughout the *Daubert* hearing. Specifically, Aronberg contradicted himself on important issues on several occasions during the hearing.   Although the record is rife with instances where Aronberg provided contradictory statements, for the sake of efficiency, the Court will discuss several of Aronberg's most glaring contradictions below.

### *Aronberg's Contradiction Regarding the Lane Encroachment*

On April 26, 2016, Aronberg testified that the two-foot encroachment by a cement barrier into the southernmost eastbound lane of Fernandez Juncos Avenue did not affect Plaintiff's decision to cross the Avenue when and where he did. *See* Docket No. 755 at 70-71.[29] The following day, after listening to Plaintiff's Counsel Ramon Segarra-Berrios argue the relevance of the lane encroachment to the Court, Aronberg shifted his opinion and stated that the encroachment affected Plaintiff's decision to cross because, "if it had been treated properly, [Plaintiff] would have never had to cross." Docket No. 754 at 25-26.[30] Several moments later, however, Aronberg again shifted his position and returned to his original position that the encroachment did not affect Plaintiff's decision on the night of the accident. *Id.* at 30, lines 2-13.[31]

---

[28] The Court provided Plaintiffs with leave to file a motion explaining or otherwise justifying Aronberg's contradictions throughout the *Daubert* hearing. However, Plaintiff elected to not address any of the statements. See Docket No. 761. Defendant Integrand, however, filed a motion addressing each of Aronberg's statements. *See* Docket No. 773.

[29] **Cobian**: What did affect his decision, according to your opinion, was the midblock, not the encroachment; correct?
**Aronberg**: Correct.

[30] **Cobian**: Right. This is my question. Did the encroachment on the south side affect the -- not the midblock. There's a difference. Did it affect [Plaintiff's] decision to cross at midblock?
**Aronberg**: In my opinion, it did, because if it had been treated properly, [Plaintiff] would have never had to cross. He could have stayed on that side of the road, because that gives the opportunity for the diversion.

[31] **Cobian**: That was not the question. And now you've cleared it. So you've confirmed to me that the encroachment, vis-a-vis the midblock, the encroachment, you can confirm it did not affect [Plaintiff's] decision on the night of the accident?
**Aronberg**: That night it did not, correct.

### *Aronberg's Contradiction Regarding Specification 638*

On April 26, 2016, the hearing opened with Aronberg cautioning the Court that he had provided an incorrect answer when he stated that he "had not mentioned [his] review of Specification 638 in [his] depositions." Docket No. 755 at 3, lines 7-16. Aronberg corrected his prior testimony and stated that he had mentioned Specification 638 on page fifty-one (51) of his first deposition. *Id*. However, defense counsel sprang up and objected to Aronberg's answer as misleading as he had allegedly not mentioned Specification 638 at all. *Id*. at 5, lines 5-25. Specifically, counsel for Defendant ACE explained that there was no reference to the word "specification" or the number "638." *Id*.[32] As it turns out, Aronberg's "reference to Specification 638" in his first deposition was nothing more than his statement that "since [his] report, [he had] reviewed plans." *Id*. Evidently, Aronberg did not, as he testified, make reference to Specification 638 in his first deposition.

### *Aronberg's Contradiction Regarding Lighting Duties*

In his preliminary report, Aronberg had concluded that the contractor "did not take steps to ensure that the streetlights in the area were not disabled." Nevertheless, on April 26, 2016, Aronberg stated that the lighting opinion was "not one of the five" opinions he intended to provide at trial. *Id*. at 145-146.[33] Unsurprisingly, moments later Aronberg shifted his position once again and stated that he "will give the opinion that the contractor had a duty to replicate the sidewalk on the south side of the road and that included lighting." *Id*. at 146.

---

[32] **Colon**: Your Honor, this is extremely misleading. We invite Your Honor, to review the deposition transcript. Because this, sir, this man came here today this morning to say that he gave an incorrect answer yesterday and that he in his deposition did mention Specification 638.
**The Court**: Now, is it mentioned or not?
**Colon**: No.

[33] **Cobian**: So what you're telling me is that that opinion is within one of these five opinions we have in this paper prepared by [Plaintiff's counsel] Izquierdo?
**Aronberg**: I don't know until I see that document . . . Okay. That opinion is not in one of the five.

### *Aronberg's Contradiction Regarding his Use of Police Reports*

During the *Daubert* hearing, when cross-examined about the data consulted prior to rendering his Report, Aronberg testified that it was not important to interview the fact witnesses. Instead, Aronberg testified that the accident report is the most important document he consults prior to rendering his conclusions. *See* Docket No. 739 at 80, line 2 and line 18. However, when confronted with this testimony days later at the *Daubert* hearing, Aronberg categorically denied having testified that the police report was more important than fact-finding witness testimony. *See* Docket No. 750 at 277, lines 11-15.[34]

### *Aronberg's Contradiction Regarding the "Bus Stop that Never Was"*

Initially, Aronberg's opinions regarding the improper placement of the cement barrier at midblock were directed at Q.B. Construction. However, he was asked whether or not he had any basis for which to state that Q.B. knew a bus stop was to be placed between the intersection and the midblock. *See* Docket No. 754 at 5-6. Aronberg stated that he had mentioned a basis "various times" in his depositions. *Id*. Later that day, when asked whether or not he was able to find any of the "various" instances where he provided the bases for the barrier placement opinion, he answered that he had been unable to find any. *See Id*. at 6, lines 17-23. He concluded, instead, that the improper barrier placement opinion "still applies, but only to CSA now, not to Q.B." *Id*. at 9, lines 1-15.[35]

---

[34] **Cobian**: Yesterday you stated that it is important for you to know what it states because you trusted more in the police reports than the fact-finding witness; is that correct?
**Aronberg**: That's not correct.

[35] **Cobian**: Well, this is the thing. Plaintiff's case, fact finding witnesses already ended. You are the last witness, sir. So do you know if they were able to prove it in the case now that you know it is not in the deposition? Do you know that? A. I would assume that they have not been able to.
**The Court**: Okay. So is there a known fall-back position which had been annunciated prior thereto and did not constitute a new theory?
**Aronberg**: Yes, Your Honor.
**The Court**: Okay. So go ahead. Ask him about that.
**Aronberg**: And the theory of the bus stop still applies, but only to CSA now, not to Q.B.

### *Aronberg's Contradiction Regarding the Importance of Contract Documents*

Aronberg provided contradictory answers regarding his analysis of contract documents delineating the duties of the defendants. Aronberg provided several opinions, discussed above, where he faulted the contractor for duties of the designer. Later, Aronberg admitted to not having read the contract between CSA and the owner's representative. *See* Docket No. 755 at 89, lines 1-15 ("I don't remember reading that contract"). However, Aronberg stood by his position that he did not need to read the contracts because he "know[s] the relationship between the designer and the owner, and the contractor and the owner, and the designer and the contractor." *Id.*; *see also Id.* at 95, lines 14-22.[36]

### *Aronberg's Contradiction Regarding the MOT's Placement of the Cement Barriers*

During the *Daubert* hearing, Aronberg provided the opinion that when he visited the scene "[t]he first thought that came to [his] mind [was that he] could see how . . . the barrier had been put on the wrong side of the edge line [by Q.B. Construction]." Docket No. 740 at 69, lines 13-22. Days later, Aronberg was confronted with the MOT drawings, which placed the barriers over the edge line. Aronberg attempted to evade impeachment by stating that "[g]iving the benefit of the doubt to CSA, it does not."[37] *Id.* at 210. Nevertheless, counsel for Defendant Integrand pressed on and, finally, Aronberg admitted that "as drawn, the barrier may be on the edge line." *Id.*

### C.   Conclusion under FRE 403 and 702

The Court presided over twelve days of *Daubert* hearing, whereupon the Court intently listened to Aronberg provide what would be his testimony if permitted to testify before the jury. Throughout the hearing, the Court also afforded Plaintiff every opportunity to demonstrate the reliability and the admissibility of Ralph Aronberg's testimony. In other words, the Court took painstaking measures to be

---

[36] **Cobian**: Mr. Aronberg, my question is you found it necessary to read those other contracts in those other instances, but you didn't find it necessary -- I know you already didn't do it, but you didn't find it necessary for this case?
**Aronberg**: Well, I actually prepared documents in the other cases. And I didn't find it necessary in this case because I've read many contracts, so I know specifically what areas I want to go look for in the contract which have to do with traffic regulation.

[37] The Court finds curious that Aronberg opted to give one defendant the "benefit of the doubt" over another.

certain that its decision regarding the motions for the exclusion of his testimony is a just one, with special attention to whether or not his reliability has been proved by a preponderance of the evidence. *See Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 79 (1st Cir. 2009) (When exclusion of an expert witness the force of a dismissal, the justification for dismissal must be robust); *see also Bourjaily v. United States,* 483 U.S. 171, 175–176 (1987)(Finding that preliminary matters, such as an expert's reliability, must be proven by a preponderance of the proof). Plaintiff has failed to meet his burden.

Plaintiff's utter disregard of Federal Rule of Civil Procedure 26 set the scene for the events of the *Daubert* hearing. In other words, the fact that Aronberg's report was sketchy, vague, and lacking in any reasoning or explanation allowed Aronberg to become a moving target during the hearing. When confronted with facts that have been available since the case was filed, Aronberg would routinely shift responsibility for one party to another. In other instances, Aronberg cherry-picked favorable facts for his opinions, such as the fact that the southernmost lane had a two-foot encroachment, and ignored facts admitted at trial that were detrimental to his conclusions, such as the fact that PRHTA prohibited the closure of the southernmost lane of Fernandez Juncos Avenue at the date and time of the accident. These tactics prove that Plaintiff and Aronberg are a dangerous combination in the courtroom.[38]

Further, Aronberg's opinions are unsupported by the evidence admitted at trial. His opinion regarding the installation of a pedestrian corridor, the cornerstone of his preliminary report, is a house of cards. The opinion rests on unsubstantiated assumptions. That is, Aronberg assumed that the process of Q.B. and/or CSA requesting reconsideration from PRHTA would be successful, which the evidence does not support. Instead, the only testimony on the record regarding PRHTA's decision to leave the southernmost lane open was provided by Ruth Vargas. That testimony was never questioned or impeached

---

[38] Aronberg admitted that Plaintiff's counsel Jorge Izquierdo-San Miguel has hired him as his expert on "about a dozen cases." Docket No. 739 at 73, lines 7-10.

and, consequently, is uncontested. Thus, Aronberg would be providing an opinion which is pure speculation and directly contradicts uncontested evidence on the record.

Additionally, Aronberg's opinion regarding lighting ignores established Puerto Rico law. Finally, there is a vast gap between the facts presented at trial and Aronberg's conclusion that Plaintiff's travel path on the night of the accident was reasonable. A gap bridged solely by Aronberg's assumptions. Thus, it is impossible to fathom how these opinions would assist the trier of fact.

Traditionally, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the . . . appropriate means of attacking shaky but admissible evidence." *Milward v. Acuity Specialty Products Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011)(quoting *Daubert*); *see also Currier v. United Techs. Corp.,* 393 F.3d 246, 252 (1st Cir. 2004). However, Aronberg's unpredictability as a trial witness is perhaps what is most glaring. He has contradicted himself on numerous occasions, several of which were discussed above, and Plaintiff has offered no explanation or justification for those contradictions. Instead, Plaintiff elected to ignore a Court order directing him to answer for Aronberg's inconsistencies. *See* Docket No. 761. For this reason, the Court cannot rely on the adequacy of the "adversarial process" when an expert is adept at evading answering the questions asked at all costs. *Id.*

The Court witnessed several instances during the *Daubert* hearing where Aronberg was backed into a corner, on the verge of being successfully impeached. Somehow, Aronberg managed to provide unresponsive answers which did not address the questions posed. For example, when confronted with PRHTA's instructions that the southernmost lane remain open, the following exchange ensued:

> **COBIAN**: Let's just read for the record what general note No. 12 states. "All construction work shall be performed during the schedule approved by the Puerto Rico Highway and Transportation Authority." And this is where they state when. "Work shall be performed from Monday to Wednesday." Do you agree with that that they are excluding Saturdays from those days, or you're still confused about it?

**ARONBERG**: I would say that it's addressing -- that note by itself, I could see why you would have an RFI because it's saying Monday to Wednesday –

. . .

**COBIAN**: Correct? Would you agree with me that they also could not work at 8:00 p.m., and that's the time, we've stipulated in this courtroom, that this accident occurred. Would you agree with me that they could not close the southernmost lane, according to that note in the MOT, at 8:00 p.m. on a Saturday night?

**ARONBERG**: No, I wouldn't agree. Because it says Monday through Wednesday. It doesn't say Saturday.

**THE COURT**: This accident was on a Saturday

**ARONBERG**: Yes. But the note doesn't address Saturday.

**COBIAN**: You just agreed with me that reading that note that Saturdays are excluded. You agreed with me.

**ARONBERG**: Correct. But then you asked a compound question about 8:00 p.m. on Saturday. It doesn't say that about Saturday.

**THE COURT**: Well -- if you say you can enter through that door only through Monday and Wednesday from 9:00 p.m. to 11:00 a.m. And you want to walk in through that door at Saturday at 8:00 p.m. Can you enter through that door at Saturday?

. . .

**THE COURT**: Entering the Court shall be performed during the schedule approved by the Puerto Rico Highway and Transportation Authority. Entering shall be performed from Monday to Wednesday from 9:00 p.m. to 11:00 a.m.

**ARONBERG**: If the door is locked on Saturday, you can't enter it whether it's 8:00 p.m. or 8:00 a.m. or any other time on Saturday.

. . .

**COLON**: Wait a minute. Do you understand it's ambiguous?

**ARONBERG**: It's ambiguous.

**COLON**:  It's ambiguous?

> ARONBERG: I can't tell you exactly what it means because it's ambiguous.
>
> COLON: So if the Court says we're only open Monday, Wednesday, and Friday. To you, is there any ambiguity of whether or not the Court is open on Tuesday and Thursday? Docket No. 814 at 134-140.

The exchange above speaks volumes to Aronberg's unreliability. Posed a simple question, with an obvious answer, Aronberg refused to respond. The Court cannot trust the adequacy of adversarial interrogation in cases where the witness refuses to provide any answer that may be detrimental to Plaintiff's position. Permitting Aronberg to testify before a jury will compromise the integrity of these proceedings.

Accordingly, having discussed Aronberg's testimony at length, the Court concludes that his testimony lacks fit to the facts of the case, does not assist the trier of fact, and is unreliable. *See Daubert*, 509 U.S. at 590-91. Accordingly, the Court hereby **GRANTS** Defendants' and Third-Party Defendants' Motions to exclude Ralph Aronberg as a witness. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)(excluding an expert who, like Aronberg, had suspect reliability, could not explain some aspects of his analysis, gave inconsistent testimony, did not adequately examine the pertinent evidence, and was unable to answer questions that should have been within his command if his other testimony was reliable).

### III.     CONCLUSION

For the reasons elucidated above, the Court hereby **GRANTS** Defendants' motions to exclude Ralph Aronberg as a witness pursuant to Fed. R. Civ. P. 26(a) and FRE 702 (Docket Nos. 823, 826, 827, 829, 830, and 831).

Accordingly, **Plaintiff is ordered to show cause by 9:00 AM on Tuesday, June 28, 2016, as to whether or not he intends to proceed in the instant litigation as the Court has excluded the only witness that could establish causation between Defendants' acts and Plaintiff's accident.**[39]

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 23rd day of June, 2016.

/s/ DANIEL R. DOMINGUEZ

DANIEL R. DOMINGUEZ
U.S. District Judge

---

[39] After excluding Ralph Aronberg as a witness, the motions at Docket Nos. 653, 663, 664, 665, 666, 667, 668, 669, 670, 684, 725, 767, and 867 are deemed **MOOT**.